Mid-City respectfully disagrees with the City's position regarding the methodology and the audit methods used. In fact, we have, in our appeal, we bring up the fact that we believe that the City violated Mid-City's due process rights. However, but there is no competent evidence presented by the, to support the agency's decision and because of that is against the manifest way to the evidence. And the law is pretty clear from a long time ago in the Goldfarb case, in 1952, the Supreme Court stated that you, you don't have to present just documentary evidence, the, the, the burden of proof from the prima facie case for, for the Department of, of the Department can be rebutted by any kind of competent evidence, including oral evidence, in this case from the President of Mid-City, Mr. Sommerfeld, who testified that the, the rental agreements, while they're all oral, they were for specific spots in the parking lots, the two parking lots, and that the, the various tenants could use it for any purposes, including tents. And there was test, there's testimony that some of the rent was for advertising signs at the locations. On the spaces? On the spaces, yes. Or on the walls of the, of the, of the parking lots. The, the audit conducted by Ms. Coleman had nothing to do, as she testified, with the actual assessment. She conducted the audit, taking the last month of the audit period, going out to the parking lots and making car counts. She testified that it had nothing to do with her assessment, her final assessment, because she did find that Mid-City had overreported the number of cars that were parked there and overpaid taxes by about $1,500, as Mr. Sommerfeld testified to. The, Ms. Coleman's assessment was based on pure speculation, which is, which is not sufficient to support a prima facie case, and rebuts their prima facie case. She was, she admitted many things during, I won't, I won't go over everything, but there's quite a few that, that affected her testimony, and Mr. Sommerfeld's, his testimony was unrebutted regarding the nature and the use of the, of the parking lot by the tenants. More importantly, the city's ordinance in the Supreme Court's ruling in the Jacobs versus the city of Chicago case, is sufficient to rebut the city's claim that the entities that were the tenants were parkers. Because in the definitions portions of the, of the ordinance at 42-36-010, and the first sentence of, of the first, of the second paragraph says, quote, charge your fee for parking, unquote, means the gross amount of consideration for the use or privilege of parking a motor vehicle in or upon any parking lot or garage in the city of Chicago. That language, the a motor vehicle in a parking space, is repeated in the tax imposed section of the ordinance, which is 4-236-0220, where it says, there is imposed upon the use and privilege of parking a motor vehicle in or upon any parking lot or garage in the city of Chicago, a tax at the ethical rate set forth in subsection D, which is subsection D of that ordinance puts forth the percentages for monthly, hourly, weekly parking. The Supreme Court in Jacobs versus the city of Chicago was asked to make a determination regarding who was the actual, who was to pay the, the, the amount of the tax. And the Supreme Court said that, that, that the person who, quote, seeks the privilege of occupying the space within the parking facility is the recipient and bears the burden of paying the tax. So the ordinance itself and the Jacobs case limits the tax to an actual parker, not a tenant like the, like the restaurant, valet service, hotel that my client rented particular portion to, in which he testified that whatever use the tenant wanted to do with the lot, as long as it did not violate ordinances in the, in the, the ultimate landlord's rules regarding liquor and things of that nature, they could do whatever they want with it. So it is our contention that the, the fact that the ALJ focused on rent out of all consideration regarding it was improper and was not based upon competent evidence. And as the court knows that fundamental due process is always in a, an administrative hearing. And this court can look at everything in the record, all questions of law and fact presented by the record. And the, the, the, the record shows that the ALJ did not confine himself and the city did not confine itself to the argument that it's presenting today regarding operator. It presented the issues regarding the, the, the audit and the methodology. Now, our second argument is that the methodology, methodology used by the city was improper and violated its own rules as judge found. The, the audit report says on page in the city's AA nine is a copy. The assessment is based on the taxpayer's failure to remit the tax due on all taxable property. In October, on October 24th of, excuse me, on February 24th of 2011, Ms. Coleman sent to MidCity a description of the, of the forms regarding how the audit would be conducted. The description of the test period method, which they ultimately use said, stated that it would be a detailed review of a mutually agreed upon sample period within the period under audit and the extrapolation of sample period results after legitimate adjustments to the balance of the audit period. What Ms. Coleman sent along with that was the form asking this MidCity to agree to that method. And she sent that after she had chosen to go to the parking lots for her in-person audit on three days in June of 2010, the last month of the audit period, the 48 month audit period she picked the last month. She did not allow MidCity parking any kind of ability to challenge or agree to this method. And as such, because of that, it is our position that the city violated MidCity's due process. Thank you. You argue that it, what they did was speculative. And my problem with that is they actually undercounted. So why are you questioning the cars? I'm not talking about operators. I'm just about cars. Why do you care when actually you were ahead of the game? I mean, sure, they could have taken a period of time more generally, but it's not going to change much because you got standard parkers there, whether it's valet or it's regular parkers. You always have the same parkers that you have in the valet only probably increase on certain holiday type events. Well, Judge, the reason why we are not, I'm sorry. Why is that speculative? Well, Judge, because as Ms. Coleman admitted in her testimony, she did not base her assessment upon any of the actions she took when she went and visited my client's parking lots in June of 2010. It was based, she testified that it was a pure math calculation that she made after she found out and determined that MidCity overpaid on the actual cars counted. She then looked at what MidCity in their documents provided was the spreadsheet of their rental income based upon providing the specific spaces of the parking lot to the tenants, the valet, the restaurants, the hotel, the other companies that they provided, that they rented to on a, it wasn't a monthly basis necessarily. It wasn't continuous and Judge, as you acknowledged, the, those types of facilities, the valet, the restaurants, the hotels, they do not have monthly parkers. They have, as you said, holiday parkers or three or four hours maybe to eat a meal at a restaurant or a day or a night at a hotel. Those are not monthly parkers. By their, by common sense, people don't monthly park through those kinds of companies and as the city says in the audit, it's based upon monthly parkers. Ms. Coleman testified she assumed that all the rental assumption is incorrect by just by common sense and by Mr. Sommerfeld's testimony. Any other questions? Go ahead, Cynthia. Is there a particular reason why MidCity confined or limited its protest to the definition of operator as opposed to, for instance, attacking the amount of the assessment? You simply, you argue here about the amount being speculative. Is there a reason that argument was not made before the administrative law officer? Because I believe it's based upon the fact that in MidCity's position at the time, then and now, is that they were acting as landlords for those tenants and that the rent had nothing to do, had nothing to do with parking itself and had nothing to do with, as the Supreme Court said in Jacobs, someone who parks, who receives the use of a space for parking. That is what the tax is based upon. In this instance, there is nothing in to show that, to rebut the testimony of Mr. Sommerfeld that those companies had the use of it for any purposes. As Justice Pacinchi said, if you put a, if they had put tents up, as unfortunately we've had to do in the COVID pandemic, that wouldn't count as parking. Putting up signs doesn't count as parking. Allowing a movie production company to use the property, which Mr. Sommerfeld testified for whatever purposes. He did not say it was for shooting movie, but they used it for whatever their purposes. That's not, there's no evidence that those companies were actually themselves parking. But Mr. Jabbers, am I pronouncing it correctly? And I apologize. It's fine. I've been called worse. Oh, we don't want to call you worse. You don't want to do that. But as between the city and mid city, who between those two would best know what the parking lot was used for? If it was a tent or if it was some, you know, pod or something other than vehicles, who best to know that between the city of Chicago and mid city? Well, Judge, if Mr. Sommerfeld testified to that, he testified to that at the hearing regarding the parking lots at issue. They were not attended parking lots. And most of the parking lots nowadays, it's my understanding are automated. You punch a thing. My understanding is those parking lots back then were either automated in as with a lift gate or you went to a box and inserted your money. He didn't go into that much detail, but he did testify that it was unattended. But the leases that the oral leases that he did testify that the oral leases that he entered with the tenants did not limit the tenants to anything regarding they had a park. In fact, the testimony was whether they parked on certain days or not was irrelevant because they paid the rent as tenants to the landlord mid city and they could use it what whatever they will. And as I previously mentioned, Judge, the common sense type of time types of use for the companies that were the tenants were more. For one of a better expression, non business hour type of type of parking situations. That ultimately mid city collected the rent and if it were a monthly Parker or an individual Parker mid city collected that as well. Yes, they did. But they did. They collected those funds as the operator of mid city. Is that correct? Yes, Your Honor. And with respect to the rent, mid city collected the rent, not as a part, not as an operator because they weren't collecting it from the individual recipients. When they were in the ordinance that talks about or that makes the distinction between a recipient and an operator. Yes, Your Honor. The ordinance does that the excuse me, Your Honor. I don't have it memorized. It is 4-236-020-G, Your Honor. And F is every person required to collect the tax imposed by this chapter shall secure the tax from the recipient at the time the price charge or rent to which it applies is collected. And it's very specific regarding recipient and the Supreme Court in Jacobs stated what recipient meant in the ordinance. And that was a Parker, a Parker, an individual Parker who was using a space. And that is that is what the ordinance says. If you use a parking space, you're the recipient. And then the ordinance also provides in another section, Section 1010, that it's the responsibility of the operator to collect and to pay the taxes on those parking spaces or the parking amounts received by the recipient from the recipient. Is that correct? It is not based. I disagree, Your Honor. I respectfully disagree. It is not based upon the parking space. It's based upon the recipient use of the parking space. And I believe the Supreme Court in Jacobs was clear on that. And in this instance, the rental income, there's no question that my client paid rental taxes, federal taxes on it. There's no question that they paid the tax on the amount of the cars that were that they actually counted and actually received and they knew parked in their lot. What we're talking about is the tenants who they rented to as a landlord, they paid them income not related to the number of people who parked in the parking lot. This is a practical matter, and this will be my last question. Just as a practical matter, how would the city of Chicago know with whom MidCity had an oral lease for the use of the parking spaces? How would they know that? If in fact, it was their responsibility to collect the taxes from the recipients, who reported to the city of Chicago that, hey, city, we now have an oral lease agreement or a rental agreement with this particular hotel, so you need to go after them for the taxes. How as a practical matter would the city of Chicago know with whom the lease agreements were made such that they would then be able to go and collect the tax from whoever was renting the space? I just don't know how that practically would work out. Well, Judge, it's our contention that there is no duty to report that because when MidCity rents the space, the portion of the lot to whoever it is, MidCity does not impose any responsibility or, excuse me, any duty upon the tenant that they have to collect money from the people who they parked there. And in fact, I believe my client clients or patrons. So, if the tax is pretty clear, it's based upon a percentage of what is charged. If a restaurant, because of how congested it is in the blocks or so by their restaurant where no one can park there, they're going to lose money if they don't offer something. So, free parking. So, that is another reason because the tax is based upon a percentage of what is actually charged and paid. It's actually paid by the recipient. It's not based upon what is charged. It's based upon what is paid. So, if there are, so if a restaurant patron pulls up and they have a, the restaurant has a valet service and the valet service runs, takes the car, parks it in a lot, and it's free parking, there is no charge and no tax applies. Now, it's my understanding regarding valet parking that since 2010, the city has amended the parking tax ordinance to have a separate section for valet parking services. I don't know particularly about that. If Mr. Henriquez wants to discuss that, that would be up to him. Is that all your questions? Okay. So, there may be a loophole in the city's ordinance, or there may not, depending on what the city thinks, for hotels that offer free parking to their customers or restaurants that offer free parking to their customers, although we're not sure whether the valet parking thing has closed that loophole. But I want to get back to two things. First is, MidCity did not object to the amount of the assessment. Is that correct? They could have. They didn't specifically object because, but they did object because they're AOL, the hearing officer, had this case, and they could have objected to the amount and said, wait a minute, wait a minute, that's way too much. Almost a half a million dollars is too much. Let's go back to the drawing board. We'll give you our documentation. We'll give you our records, and let's figure out what we really owe you, if anything. They didn't do that. Well, they did give them their records, and Judge, my understanding is they provided, they didn't have written leases. It's my understanding that they provided copies of checks and things like that that they had. For the whole period, or just for the couple of days? I believe it was for the month of June, because I think that was what the audit period was focused on, the month of June of 2010. It's my understanding. However, they did provide answers to interrogatories, which I included in my brief, pages AAA18 through AAA22, your honor, which they, for the whole time period, they set forth the rental space. Yes, the rental property. Yes, Judge. The ordinance doesn't really care whether somebody parks there for 10 minutes or 24 hours. It's just as long as they park in that space. Well, Judge, it does, because the ordinance, the tax is imposed by the amount actually paid. So if you parked for an hour, and it's $10, I believe it would be 20% at the time, on a Saturday or Sunday, and 22% for Monday through Friday. If you parked on a weekly basis, it's 22%. And if you park on a monthly basis, at the time, it was 22%. So the tax is imposed based upon the time actually used by the parker, which is consistent with what the Supreme Court says. So I'm just troubled because Mr. Enriquez said that the assessment was admitted without objection, and MidCity did not provide testimony or any documentation. And you're telling me that they did provide testimony. I included the answers in interrogatories. I do not know, and I do not think, because I didn't see them in the record, that the documents themselves that were produced were included as part of the record. My understanding is they were produced. All right, I have two more questions. The first is, to the best of your knowledge, do you know if the final assessment did include in the extrapolation the overpayment in the overcount of cars that was taken into consideration? Judge, I am not sure. I don't recall if Ms. Coleman testified to that or not. I do not. I'm sorry. I don't recall that. And my second question is, at this time, during the time that there was a hearing by the administrative hearing officer, Mr. Sommerfeld, acting as the owner and president of MidCity, was unrepresented in testifying on behalf of MidCity. Is that correct? And he was providing whatever information the hearing officer had. Yeah. Are you talking about at the administrative hearing? No, my understanding is counsel represented. He was represented by counsel at the time. I forgot his name. I think it's Chimerey. Judge, it wasn't myself. All right. Okay. Hey, let's, Julian, respond to what he said. You don't have to respond at this point to the definition of operator. I'll let you both have maybe five to eight minutes, because we're running late now as to that topic. But go ahead on your response to his comments. All right. Yes, your honor. The city's parking tax ordinance, I think, is perfect. There are no holes in it. Mr. Javers has misconstrued various provisions of it. There's a difference between the taxpayer and the tax collector. The parking lot operators are the tax collectors. They must collect the tax, even though the tax is imposed upon the recipients of the privilege of parking. So the tax is always turned over to the city by the parking lot operator, unless the operator fails to. Then in which case, then the city has the option of going after the recipient. So the question, and when the operator as the tax collector has the obligation to collect the tax from the recipient of the privilege to park. It's not from the parker. It's from the recipient of the privilege to park. And we explain this in our brief. The recipient of the privilege to park is the parking, valet parking services, restaurants, and other entities that rented the space. They rented the space and thereby obtained the privilege to park. They don't have to exercise that privilege. They could have used it for other purposes. But we haven't had any evidence in this case about any amount that might have been collected by MidCity for the use of, for any purpose. It is acknowledged, uncontested in this case, that the privilege to, that in all of these spaces, there was no prohibition. None of the oral agreements prohibited any of these tenants, valet parking services, restaurants, other entities, none of the oral agreements prohibited them from using the spaces for parking. That means they had the privilege to park there. And Mr. Somerville testified at the administrative hearing that in fact those entities parked vehicles there. The recipient is not the parker. The recipient is the valet parking services and the restaurants and other entities because they are the recipient of the privilege and the section of the ordinance that says that those are the entities that are the taxpayers from which the garage must collect the tax. That section is section 4-236-020E. And other sections surrounding it, including subsection F and G, define what is meant by recipient. So contrary to Mr. Javers' position, recipient is not the parker, the individual person. They don't even park the cars for the valet parking services. Valet parking services we know exist to park the cars for people who bring the cars to them to park. It may be that some people, some individual car owners might have parked in those spaces. But the primary use of those spaces is of course the valet parking services would have been the actual, their employees would have actually parked the cars, not the person who brought the car to them to park. But regardless, the restaurant rented the space. They became the recipient of the privilege to park their customers' cars there. We explain this in our brief. And so it's not correct to say that the recipient is the parker. The recipient is not the parker and nothing in the Jacobs case suggests otherwise. With respect to the, and again I return to the point that when the assessment was received by Mid-City and it made a protest, it filed a protest, the protest mentioned only one ground. It mentioned only the ground that it asserted that it was not a parking lot operator as to the rent it collected from the valet parking services, restaurants and other entities. It did not mention one word about audit methodology or the amount of the assessment. And in fact, throughout the litigation, it repeatedly conceded, and we explain in our brief, we point out those places in our brief, it repeatedly conceded that it was not contesting the audit methodology or the amount of the assessment. All right, let's move on to the other case. Judge, can I? No, you cannot. Thank you. No, you cannot. You had your chance. Julian, start the other case. Well, the other case is not my, it was not the city's appeal. That was Mr. Sommerfeld's appeal. So, but I will start it if you wish me to. Well, Mr. Jeffrey, you proceed on that case then. Yes, Judge, Jeffrey Javors on behalf of William Sommerfeld, Your Honor. It is our position that there is a, the ALJ's position in this case is correct because he found that Auditor Coleman, her position regarding why she sent the notice of assessment to Mr. Sommerfeld by express mail and not by certified mail was, was unbelievable. And reversal is required only if it's clearly erroneous that that decision is, was wrong. In this case, Ms. Coleman had the opportunity and the duty because of the URPO, the ERPO, I think I'm pronouncing that right, regarding responsible officer liability. She had, it says in section 3-4-040A paren 1, that the department under the chapter has to, notice must be given at, at the person's last known address. Okay. Or if the person is not a natural individual addressed to the person concerned at the address identified as the address of the person's registered agent, officer, partner, or other agent. In this instance, there's no question that Mr. Sommerfeld was the president of Mid-City Parking, but he is being asked, he's being required as the responsible officer to pay an assessment that's not final against Mid-City. There has been no finding. We've just had that argument about Mid-City and whether they owe the assessment. The notice that was, in my opinion, was premature, was sent to Mr. Sommerfeld 11 days after the notice was sent to Mid-City Parking. And as the court found, as the LJ found, the, the notice sent by express mail with no evidence that it was actually received by Mr. Sommerfeld or any responsible person at Mid-City's office was, was improper for two reasons. One, the last known address that they had for Mr. Sommerfeld was his address in Western Springs, Illinois. He had been sent a taxpayer information sheet by the city, and it's attached to the city's supplemental appendix as pages 6 through 12. And there are three spots on page, pages 8, 9, and 11, where Mr. Sommerfeld gives his address in Western Springs. Now, at no point in time in that form, and nowhere in that form, does he give his address at, at Mid-City Parking office. It identifies Mid-City Parking, and it identifies Mid-City Parking's office, but it does not identify Mr. Sommerfeld as his last known address. So the court, the LJ, ALJ's finding is, is not contrary to competent evidence and is not clearly erroneous. And in fact, once again, the Supreme Court in the Pape case, 1968, says that the, the responsible officer should be sent to, notice, should be sent to their last known address as given to, by that person to the administrative agency. In this case, it was the Western Springs address. So for two reasons, one, the court's finding that Ms. Coleman's testimony that she sent it by the express mail, which was out of the ordinary, where she testified that every other document she sent was by certified mail with a green card return receipt. And by the fact that the city requested the information regarding the last known address was given that information by Mid-City and Mr. Sommerfeld for his home address in Western Springs, and he was never served. There's no question that he was never served in Western Springs. And the ALJ's finding that the, the notice and the assessment was improper, should be upheld. There are any questions? Any questions? I do. I mean, he, he signed for it at the business office address, signed the green cards at the business office address, right? Yes, Judge, that is the, that is the notice that was sent right after the first notice was sent, right? The first notice was sent by the express mail. Okay. And he stayed, he had testified that he did not receive it. And the express mail receipt does not show any signature or any identify any person that received it. But it was received. It was not received because, because the problem, the problem was because it was not received, Mr. Sommerfeld did, was not given the opportunity to file a protest. That's not my question. The post, the US post office express mail tracking number shows that it was delivered. It was delivered to the building, Judge. Delivered to the building, but not to the office. It does not show that it was delivered to the office. And in fact, there is, there was no testimony, no evidence presented that the actual assessment was included with the letter notice sent by Ms. Coleman in the original express mail package. She testified only that she put the notice letter in the envelope. She did not testify that she put the assessment, the actual assessment notice in the letter. And again, there, there, there was the, there was an issue regarding the addresses to MidCity. Two different zip codes were used in two different documents. And while Judge McGinn said, well, I can take judicial notice. I do not, there was, there's nothing to show that the, the two zip codes were the same. There's, and why there's no evidence why the two different zip codes were ever used. There is evidence that the city changed the zip code. The judge, the city changed the zip code for the second notice. Are you telling me that somehow this express envelope gets into the building somehow, but the post office is not responsible for making sure that it gets into the mailbox of the actual company it's addressed to. It's just, it's in a basket someplace on the floor and people are supposed to pick up their own mail. And if they do or they don't, you don't know. Judge, it's my understanding that the express mail package is supposed, was supposed to be delivered personally to Mr. Sommerfeld at his office. At the MidCity address. At the MidCity address. And two, the, the, the document itself, the express mail tracking receipt does not show that it was received by Mr. Sommerfeld. And then there was the problem with the two different zip codes. Why were two different zip codes used in the same, the same envelope? All right. You've repeated that twice now. We have to start moving because you guys are way behind. Any further questions? I pass. All right. Julian, you may respond. Yes, the, yes, your honor. The, uh, ERPO permits the city to serve any kind of notice by other than personal service. It satisfies three requirements. One, it must send the notice by any of several types of delivery. One of which is express mail. Two, it must send the notice to quote the person concerned and three, it must send it to that person at his quote last known address. Here, the circuit court reversed the ALJ's decision and concluded that the responsible operator officer assessment that the city sent Mr. Sommerfeld on November the 10th, 2011 complied with all three requirements. And this opening brief on this appeal, Mr. Sommerfeld did not contend that the city failed to satisfy any of those requirements. He thereby waived any contention that the notice was improper. In any event, it is plain that the city satisfied the three requirements. First, the undisputed evidence at the administrative hearing established that the city sent the responsible officer assessment by express mail, which is one of the types of delivery that the ordinance expressly permits the city to use. Second, with respect to a tax assessment, quote, the person concerned, unquote, is plainly the person against whom the city issued the assessment. Here, this was indisputably Mr. Sommerfeld and it is also undisputed that he is the person to whom the city sent the responsible officer assessment. Finally, whether the city sent the responsible officer assessment to Mr. Sommerfeld's quote last known address depends on whether the phrase last known address includes his business address at nor did he even mention the phrase last known address. That is undoubtedly because the phrase plainly includes his business address at MidCity. The responsible officer assessment was not the first document the city mailed to him at that address. It had also mailed to him at that address the January 11, 2011 letter giving notice that the city would audit MidCity and he signed the certified mail green card stating that he received that letter on January 20, 2011 at that address. Moreover, shortly thereafter, he completed MidCity's taxpayer information form stating that he is MidCity's president and its primary contact person as well as the person responsible for the preparation, review, and attestation of information contained in MidCity's Chicago tax returns. And he included on that form both MidCity's office address and his home address. In addition, MidCity's office address is an address he has listed for his personal email and one at which he acknowledges he has received personal mail. It is also the address to which the city mailed him and at which he acknowledges he received the 30-day notice letter dated February 2, 2012. And finally, Mr. Sommerfeld's representative conceded during an earlier hearing before the ALJ that Mr. Sommerfeld filed his protest quote late which necessarily means that Mr. Sommerfeld received the responsible officer assessment when it was mailed to him on November the 11, 2011. Thus, the ALJ's ruling that the city did not give Mr. Sommerfeld proper notice of the responsible officer assessment was clearly erroneous and the circuit court correctly reversed that ruling. Now, in his reply brief, Mr. Sommerfeld contends that the city's issuance of the responsible officer assessment to Mr. Sommerfeld was premature because the city has not fully litigated the separate assessment it issued to MidCity. That argument is procedurally barred because as we have explained, Mr. Sommerfeld raised it in a proceeding seeking a determination that the responsible officer assessment against him is a quote debt due and owing to the city that may be enforced in court. And today, Mr. Sommerfeld apparently, Mr. Javers does not address that argument today so I take it that his choice not to address it in his argument today means that Mr. Sommerfeld must not be pursuing that argument just as he had not pursued it below. I have no further remarks and would be happy to entertain any questions. Questions? No questions? All right. Jeff, you get to respond. Well, Judge, I respectfully disagree with Mr. Enriquez. Mr. Sommerfeld did testify that it and raised in the opening brief and I'm not conceding that the assessment was premature. The city itself today this morning said, well, if you find against, if you don't find against MidCity, we're not going to pursue Mr. Sommerfeld because if I understand it correctly, they understand that the responsible officer finding can only be made if you look at their rules, can only be made after a final determination against the entity, in this case, MidCity. So if they're not asking for two bites of the apple and duplicative damages or duplicative tax amounts, it has to be premature. Thank you. Thank you both. This is kind of convoluted. It sounds like the city ought to go back and clean up that ordinance. I mean, it's written, but even I remember at times their ordinances needed a paragraph to explain what the definition meant. So we'll keep going over this, but I thank you both. You both made very nice arguments and well represented your clients, which in this case is difficult. So we'll let you know as soon as we work this out in our